**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Howard Dale BERNARD, Gordon Rae Childress, Sammy Brice Brock, Roger Lee Bard, Russell Richard Cochran, Defendants-Appellees.**

**No. 78–3033.**

United States Court of Appeals, Ninth Circuit.

Sept. 27, 1979.

Rehearing Denied Nov. 28, 1979.

Revised April 28, 1980.

Walter E. Schroeder, Crim. Div., Washington, D.C., for plaintiff-appellant.

John S. Ransom, Portland, Or. (argued), for defendant-appellees; Michael R. Shinn, Frank Noonan, and Gerald R. Pullen, Portland, Or., on brief.

Before KILKENNY and ANDERSON, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

The defendants-appellees are charged with conspiracy to manufacture methamphetamine, a controlled substance, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 846, and with two substantive counts relating to the manufacture and possession of methamphetamine, in violation of 21 U.S.C. §§ 812 and 841(a)(1) and 18 U.S.C. § 2. The Government, pursuant to 18 U.S.C. § 3731, has appealed from an order of the district court granting defendants' motions to suppress evidence seized at the time of their arrests.

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

## Factual Background

In October, 1977, Michael Brown, who was under arrest for manufacturing methamphetamine, told Drug Enforcement Administration (DEA) agent Michael Fredericks that he and defendant Howard Bernard had been involved in manufacturing methamphetamine during 1977. Brown further informed Fredericks that Bernard and two other persons currently operated a clandestine methamphetamine laboratory in Umatilla County, Oregon, and that through a legitimate "front" business,[1] they would be purchasing and stockpiling chemical ingredients for the manufacturing of methamphetamine sometime around March, 1978. Subsequent DEA investigation and surveillance activities corroborated much of this information.

The information that Bernard was stockpiling chemicals was reinforced by his purchase of chemicals used in the production of methamphetamine on at least four occasions.[2] DEA agents learned that Bernard, using a pickup truck registered to defendant Sammy Brock, had recently purchased a large quantity of chemicals in Portland, Oregon.[3] They also observed him make purchases from a supply house in Spokane, Washington in December, 1977 and later in March, 1978. On the latter occasion, the agents, through use of an electronic beeper attached to a canister of chemicals, tracked the chemicals to a suspected drug trafficker's residence in Clarkston, Washington and later picked the signal up in Meacham, Oregon at defendant Brock's residence. The final purchase occurred on April 6, 1978, the day before the agents made their arrests.

DEA agents observed defendants Childress and Bard pick up an order placed by Bernard at the Spokane supply house.[4] After purchasing the chemicals, the defendants flew to Hermiston, Oregon, where they ultimately drove to 456 Madrona Street, defendant Childress' residence.

Other events fostered suspicion that Bernard and his associates were engaging in illegal activities. When they picked up the chemical ingredients from the Spokane supply house, the defendants conducted what appeared to be counter-surveillance in an attempt to determine whether law enforcement officers were watching them.[5] Informer Brown's estimate that methamphetamine production would begin around March, 1978 was partially corroborated by other informer tips in early April that methamphetamine would be manufactured in the Clarkstown area soon and then be made available in the Hermiston-Pendleton area.

On April 7, the date they arrested the defendants, the DEA agents were conducting surveillance at defendant Brock's Meacham, Oregon residence where they were still receiving a signal from the beeper, and defendant Childress' residence in Hermiston, Oregon, where Bard and Childress had driven with the April 6 purchase of chemicals. During the early part of the day, the agents encountered defendant Bard at a restaurant in Hermiston and followed his jeep to a mobile home camper parked at a mobile home park. Waiting with the mobile home were a green jeep, owned by defendant Cochran, which had earlier that day been seen at Brock's Meacham resi-

---

1. Bernard claimed to be in the business of manufacturing fertilizer.

2. When questioned during the investigation, Bernard told DEA agents that he was purchasing the chemicals to produce fertilizer.

3. American Supply, where Bernard purchased the chemicals, became suspicious of Bernard's large orders and notified the DEA.

4. Bernard had phoned the supply house that Childress would pick up the chemicals Bernard had ordered.

5. For instance, during the December, 1977 purchase of chemicals Bernard led the agents on what they termed a "wild goose chase". During the pick up of chemicals on April 6, 1978, one of the defendants went to a phone and feigned a call, apparently to check the chemical supply house lobby for the presence of DEA agents. Later when they reached Hermiston, the defendants drove to their destination in a very circuitous manner, apparently in a continuing attempt at counter surveillance. (Aerial surveillance indicated that at one point they drove into a school parking lot, turned around, and waited).

dence, and a rented Toyota. At approximately 2:00 P.M. the vehicles drove north to a recreational area, Hat Rock State Park, bordering the Columbia River.

At the state park, the motor home parked approximately 20 yards from the river. The other vehicles criss-crossed throughout the area conducting what DEA agents thought was counter-surveillance. From aerial surveillance DEA agents observed the defendants carrying boxes of unknown contents from the vehicles to the motor home.

During the course of the afternoon DEA agents and police officers, both on foot and in vehicles around the park, observed the activities at the mobile home. Agent James Nielsen testified that he observed that the defendants had all of the vents and the door on the mobile home open, but kept the curtains drawn. One curtain facing the road where vehicles might approach, however, was partially opened in a V-shape. Nielsen also testified that he observed two significant events at approximately 5:30 P.M. First, he saw two persons, whom he identified as Childress and Bard, leave in the Toyota and return approximately ten minutes later. He then heard persons whom he believed to be Bard and Childress, telling their companions that DEA agents were still staking out the park. At about the same time, Nielsen observed a person, whom he identified as defendant Brock, rush out of the mobile home "gasping, breathing deep," and "shaking his head" in an apparent effort to get some fresh air.[6]

About ten minutes after observing Brock gasping for air, agent Nielsen conferred with agent Lackey, who was also watching the mobile home. From what they had observed, they concluded that the suspects were using the mobile home as a laboratory to produce methamphetamine. Slightly after 6:45 P.M., agent Fredericks arrived and conferred with Lackey, but not with Nielsen. Lackey told Fredericks that he concluded that the suspects were manufacturing methamphetamine, but he failed to inform Fredericks of the two incidents which Nielsen observed at 5:30 P.M.[7]

Based upon the information gathered during the investigation, the observations Lackey related to him, and Lackey's conclusion that the suspects were producing methamphetamine in the mobile home, Fredericks authorized the warrantless arrests. At about 7:00 P.M. the agents surrounded the motor home and arrested Bernard, Childress, Brock, Bard, and Cochran.[8] The agents then searched the mobile home, discovering that the suspects were apparently producing methamphetamine.

### District Court Proceedings

Following a pretrial suppression hearing, United States Magistrate George Juba recommended that the court deny the defendants' motions to suppress all evidence as fruits of an arrest unsupported by probable cause.[9] On the date set for trial, District

6. Nielsen also testified that he smelled something "cooking", but at the time, he could not identify it as chemicals that might be used to produce methamphetamine.

7. Specifically, these were the choking incident involving Brock and the conversation among the suspects that they knew they were under surveillance.

8. They were unaware that Bernard was in the mobile home prior to this time.

9. Judge Juba found the "important facts" supporting probable cause to be: "agents knew persons in mobile home were associated with narcotics users and traffickers; knew that some of the persons in mobile home were recently in possession of or had access to chemicals used in making methamphetamine;

were informed that Bernard was running illegal amphetamine lab; observed clandestine activity among defendants culminating in their secluding mobile home and numerous vehicles in remote section of state park during April; doors of mobile home open towards river and vents open; one person exits mobile home appearing as though he was having trouble breathing (which may be caused by fumes from choking chemicals)". The magistrate also found the agents had probable cause for the search of the motor home for the same reasons they had probable cause to believe that defendants were committing an offense. Finally, he found justification for the warrantless search of the motor home as an inventory search; as a

Judge Otto Skopil, at the Government's request, conducted a *de novo* evidentiary hearing on defendants' suppression motions. After taking additional testimony and reviewing the record before the magistrate, Judge Skopil held that the Government lacked probable cause to arrest and granted defendants' motions to suppress derivative evidence.[10] In reaching this conclusion, the court ruled that (1) the Jencks Act required suppression of all testimony given by agent Nielsen at the suppression hearing since Nielsen had destroyed observation notes he made at the scene of the arrest, and (2) the court could not consider the alleged incident where Brock exited the mobile home gasping for air as part of agent Fredericks' factual foundation for a probable cause determination since Fredericks was unaware of this incident at the time that he authorized the arrests. The court also found that even if Nielsen's testimony was considered, the DEA agents still lacked sufficient information to form a foundation for probable cause.[11]

> search under exigent circumstances; and as an "automobile exception" search. The only witness to testify at the hearing was Agent Fredericks.

**10.** Agents Nielsen and Fredericks testified at the *de novo* hearing. Defendants put Russel Murray, a resident of the area where the arrest occurred, on the stand to impeach some of the Government's testimony.

**11.** After striking Agent Nielsen's testimony as a sanction under the Jencks Act, the court made the following finding concerning probable cause:
> Without the testimony of Agent Nielsen, the Government's claim of probable cause cannot stand. Although there had been some prior suspicion of some of these defendants because of their contact with Mr. Bernard, that was not sufficient to justify an immediate warrantless arrest. The agents did not even suspect that Mr. Bernard was in the trailer. The "beeper" was still in the Meacham cabin, 60 or 70 miles away. No chemicals or equipment had been traced to any of the vehicles at Hat Rock State Park. None of the agents smelled anything "cooking". Agent Fredericks had no knowledge of the alleged incident where defendant Brock exited the motor home, having trouble breathing. The evidence that they did have gave them enough for a suspicion of what was going on

## Issues on Appeal

This appeal raises two issues: (1) did the district court err in excluding Agent Nielsen's testimony under the Jencks Act because the agent destroyed his rough observation notes after incorporating them into a final report; and (2) did the district court err in determining that the Government lacked probable cause to arrest?

## Suppression of Agent Nielsen's Testimony

During the suppression hearing, it was discovered that Agent Nielsen had made rough observation notes of the events which occurred at Hat Rock State Park prior to the arrests. He later lost or destroyed these notes after completing a typed report of the events leading to the defendants' arrests. The district court held that the Jencks Act[12] required the exclusion of Agent Nielsen's testimony at the suppression hearing because he failed to preserve his notes.[13] The decision was based on the court's interpretation of *United States v.*

> in the motor home; which turned out to be correct.

**12.** 18 U.S.C. § 3500 (the Jencks Act) provides in pertinent part:
> (a) In any criminal prosecution brought by the Unites States no statement or report in the possession of the Unites States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

**13.** The court also excluded Nielsen's testimony as a sanction required by the Jencks Act because the Government failed to timely supply the defendants with a copy of Nielsen's more formal typed report.

*Harris,* 543 F.2d 1247 (9 Cir. 1976) where this court held that rough notes taken by the FBI during the course of an investigation were potentially discoverable material and, therefore, subject to production under the Jencks Act.[14]

Under the Jencks Act, however, the Government is not required to produce "statements and reports" until the witness "has testified on direct examination in the trial of the case". It is well established in this circuit that the statutory language "trial of the case" does not include pretrial suppression hearings. *United States v. Curran,* 498 F.2d 30 (9 Cir. 1974); *United States v. Spagnuolo,* 515 F.2d 818 (9 Cir. 1975).[15]

Defendants recognize that "trial of the case" has been construed to mean the actual trial, but argue that the prior holdings should be overruled "because (1) no demonstrative Congressional history dictates them and (2) they unduly subvert the landmark *Brady*[16] holding that . . . 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution'."

We find *Curran* and *Spagnuolo* controlling. Nor are we persuaded that there is merit in either of defendants' contentions. They first argue that in all probability Congress did not consider the question of whether a suppression hearing is itself a "trial" or at least an integral part of the trial. They suggest that if Congress had objectively considered the federal criminal process, it would have concluded that Jencks must be applicable to suppression hearings, at least where such hearings cannot be otherwise fairly conducted.[17] We do not accept this argument. We cannot hypothesize that Congress would have added pretrial suppression hearings to the scope of the Act had the members thought about it. Even if we were to accept defendants' argument that Congress would have so acted, "it is not our function to engraft on a statute additions which we think the legislature logically might or should have made." *United States v. Cooper Corp.,* 312 U.S. 600, 605, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941).

We also disagree with defendants' contention that restricting application of the Jencks Act to the trial of the general issues subverts *Brady v. Maryland.* Rather, *Brady* exists as an independent foundation to preserve evidence and is not intended to override the mandate of the Jencks Act. *United States v. Harris,* 543 F.2d 1247, 1252 (9 Cir. 1976); *United States v. Harrison,* 524 F.2d 421 (D.C.Cir. 1975); *United States v. Dotson,* 546 F.2d 1151 (5 Cir. 1977). To fall within the scope of *Brady,* the material must be (1) suppressed by the prosecution, (2) favorable to the accused, and (3) material to either guilt or to punishment. *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).[18] In the case before us, the claim that *Brady* is violated fails at least on the third requirement. "[T]he issue [at this hearing] is the preliminary one of probable cause, and guilt

---

14. In *Harris* and FBI agent had interviewed the defendant and destroyed the notes he made at the interview after incorporating them in a formal report. While the court found that the failure to preserve the original notes in that case was harmless error, it was made clear that the "FBI must hereafter preserve the original notes taken by agents during interviews with prospective government witnesses or with an accused". *Harris* was decided on September 23, 1976. The notes which Nielsen destroyed were made on or after April 7, 1978.

15. Other circuits have reached the same conclusion. See, *e.g., United States v. Sebastian,* 497 F.2d 1267 (2 Cir. 1974); *United States v.*

*Montos,* 421 F.2d 215 (5 Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970).

16. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) discussed, *infra.*

17. Defendants' argument is based primarily on the dissent in *United States v. Spagnuolo, supra,* at 821–824.

18. In *Brady,* the Court indicated that evidence was material if it "would tend to exculpate [the accused] or reduce his penalty". *Id.* 373 U.S. at 88, 83 S.Ct. at 1197.

or innocence is not at stake." *McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967). Agent Nielsen's observations just prior to the arrest will neither exculpate the defendants nor reduce their punishment when offered on the issue of probable cause.[19]

We conclude that the court erred in suppressing the testimony of agent Nielsen and imposing Jencks Act sanctions against the Government at the suppression hearing.

### Nielsen's Testimony at Trial

We deem it appropriate, under the circumstances of this case, to determine, as the Government has requested, whether Nielsen's testimony would be admissible at the trial.

In *United States v. Harris, supra*, this court held that government agencies must "preserve the original notes taken by agents during interviews with prospective government witnesses or with an accused. The preservation of such evidence is necessary in order to permit courts to play their proper role in determining what evidence must be produced pursuant to the Jencks Act or other applicable law." 543 F.2d at 1253. *Harris* was followed in *United States v. Robinson*, 546 F.2d 309 (9 Cir. 1976). See also *United States v. Harrison*, 524 F.2d 421 (D.C.Cir. 1975).

*Harris, Robinson,* and *Harrison* all involved rough notes made by government agents of interviews with the accused or prospective government witnesses. Each court found that the rough notes were statements within the meaning of the Jencks Act, 18 U.S.C. § 3500, which defines the term "statement", in relation to any witness called by the United States, as "a written statement made by said witness or otherwise adopted or approved by him". § 3500(e)(1).[20] The Government contends that the term "statement" should not be

"read so broadly as to reach surveillance notes". The Government argues:

To include fragmentary surveillance notes, which are almost never a complete account of the witness' observations, considering the time limitations and lack of opportunity to take detailed notes during surveillance operations, invites distortion and misquotation. Such cursory notes can not accurately be described as being "adopted or approved" by the agent since they are incomplete and not in context.

We have found no case where the *Harris-Robinson* rule has been applied to rough surveillance notes. In *United States v. Lane*, 574 F.2d 1019, 1022 (10 Cir. 1978), the court found surveillance notes distinguishable from interview notes, saying in part:

However, the cited cases each consider the practice only as it pertains to agent's notes taken contemporaneously with an *interrogation.* The agent's notes in such regard are intended to reflect only the informed accused's or a witness' statement. It is obvious that any deviation from the notes appearing in the official report of the statement may furnish an aid to an accused. Such is not our case. The subject notes concerned the undercover agent's activities. The notes are not written contemporaneously but hours, even days, later. The very existence of such notes constitute a real hazard to the undercover agent. Interrogation notes are intended to be factual only. Notes of undercover activity may well contain impressionary matter involving diverse persons. We think it would be a judicial invasion into proper law enforcement to *require* the preservation of such notes

.  .  .  .

We are persuaded that the distinction recognized in *Lane* is a proper one. Rough interview notes involve a recording of potential testimony of another person— an accused or prospective witness. The

---

**19.** We do not hold, however, that *Brady* will never apply to a pretrial proceedings.

**20.** The term "statement" also includes "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a

substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." § 3500(e)(2).

notes are factual only. The agent has an opportunity to prepare complete initial notes during the interview. Those notes may well constitute a statement as defined in § 3500(e).[21] On the other hand, rough notes of an agent's surveillance activities are often sketchy and incomplete, made in a hurry, at different times, and will include the agent's own impressions and conclusions. When his written report is prepared, additional material may be included. We are convinced that the holding in *Harris* and *Robinson* should not be extended to rough surveillance notes.

Our holding is consistent with the Supreme Court's construction of the term "statement" in *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), where the Court set forth in detail the legislative history with respect to the adoption of the Jencks Act, following the decision of the Supreme Court in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). The Court said in part:

> One of the most important motive forces behind the enactment of this legislation was the fear that an expansive reading of *Jencks* would compel the undiscriminating production of agent's summaries of interviews regardless of their character or completeness. Not only was it strongly feared that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process and thereby injure the national interest, but it was felt to be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investiga-

tor's selections, interpretations and interpolations.

*Id.*, 360 U.S. at 350, 79 S.Ct. at 1223. It is clear that Congress was concerned that only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on "substantially verbatim recital," and "continuous, narrative statements made by the witness recorded verbatim, or nearly so . . . ." . . . that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital.

*Id.* at 352, 79 S.Ct. at 1224–1225.[22]

The Supreme Court in *Palermo, Augenblick,* and *Goldberg* was of course concerned with interview notes and their use for impeachment purposes. As in *Harris, Robinson,* and *Harrison*, there was no mention of surveillance notes. We are satisfied that the Jencks Act was not intended to cover rough surveillance notes of the type Nielsen made and later destroyed when he prepared his written report. The destruction of the notes will not preclude his testifying at trial.

### Probable Cause

■ An arrest without a search warrant and a reasonable search incident to the arrest are valid if the arrest is based on

---

**21.** The Supreme Court has recognized, however, that rough notes regarding interviews may not be statements under § 3500(e), where they are not "substantially verbatim" statements and are merely "a memorandum giving names, places, and hours." *United States v. Augenblick*, 393 U.S. 348, 354–55, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969). See also *United States v. McSweaney*, 507 F.2d 298 (9 Cir.

1974), and *Wilke v. United States*, 422 F.2d 1298, 1299 (9 Cir. 1970), where this court followed *Augenblick*.

**22.** See also discussion of the definition of "statement" and the effect of *Palermo* in Mr. Justice Stevens' concurring opinion in *Goldberg v. United States*, 425 U.S. 94, 112, 96 S.Ct. 1338, 1349, 47 L.Ed.2d 603 (1976).

probable cause. The test if probable cause is whether at the moment of arrest the facts and circumstances within the knowledge of the arresting officers "and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).[23] See also *United States v. See*, 505 F.2d 845, 854–855 (9 Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975). "In applying these standards, we must consider *all* the facts known to the officers and consider *all* the reasonable inferences that could be drawn by them before the arrest." *United States v. Martin*, 509 F.2d 1211, 1213 (9 Cir.), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975). (Emphasis in text). If the officers have probable cause to make the arrest it is not necessary to prove exigent circumstances to justify a warrantless arrest. *United States v. Watson*, 423 U.S. 411, 423, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1976).

### (1) *Information Possessed by Agent Fredericks*

At the time Agent Fredericks authorized the arrests, his own investigation had provided him with the following information: (1) an informant's tip that defendant Bernard was operating an illegal methamphetamine laboratory and might be ready to produce the drug sometime around March, 1978; (2) corroborating surveillance information that Bernard was purchasing the ingredients necessary to produce the drug and that some of the chemicals were located in Meacham, Oregon and probably in the Hermiston, Oregon[24] area; (3) knowledge that Bernard and his associates acted suspiciously while purchasing chemicals, indicat-

ing that they were conducting counter-surveillance; (4) knowledge that Bernard had phoned the supplier of chemicals the morning of the day before the arrest that Childress would pick up the chemicals, and that Childress and Bard did in fact pick them up that afternoon; (5) knowledge that vehicles which had been at the residence in Meacham and Hermiston, where some of the chemicals were located, were together at the scene of the arrest; and (6) knowledge that Bernard associated with suspected drug traffickers. This information gave agent Fredericks strong reason to believe that Bernard and certain of his associates were indeed contemplating the manufacture of methamphetamine in the not too distant future. The information, however, did not show where or exactly when the laboratory operations would occur.

We turn now to events which were specifically related to agent Fredericks by other agents at the scene of the arrest and inferences he drew from that information. Agent Fredericks testified before Judge Skopil that he made the decision to arrest the defendants on the basis of the following: (1) the pre-April 7 investigation information summarized above; (2) an inference that the location of the mobile home in an isolated area would be a suitable site for a clandestine laboratory operation; (3) some of the persons identified at the park had assisted Bernard in purchasing chemicals; (4) an inference that the boxes transferred from the vehicles to the mobile home contained the ingredients for producing methamphetamine; (5) an inference that the vents and doors of the mobile home were left open to provide ventilation for the lab and that the curtains were drawn to conceal the operations; and (6) an inference that the defendants were involved in counter-

---

**23.** The Court in *Beck v. Ohio* also quoted from *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879: "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the

mercy of the officers' whim or caprice." 379 U.S. at 91, 85 S.Ct. at 226.

**24.** The time for production was further corroborated by DEA informant information that a quantity of the drug had or would become available in the Pendleton-Hermiston area in early April. The tip, however, did not indicate who would provide the methamphetamine.

surveillance activities when they were driving in the area around the park.

■ We agree with Judge Skopil that the specific information known to agent Fredericks was insufficient to warrant a prudent man in believing that the defendants were committing an offense. Other inferences could reasonably be drawn from many of the facts upon which he relied. Although taken together these events might create suspicion in the minds of agents looking for signs that a particular crime is being committed, they fall short of the factual basis necessary to make a finding of probable cause. Moreover, neither Fredericks nor the other agents were aware that Bernard, the focus of the investigation, was present at the park until after the arrests were made.[25] Fredericks was unaware of the incident concerning Brock's choking or of the possibility that agent Nielsen may have smelled something cooking.

### (2) Information Possessed by other Agents

The Government argues, however, that we need not confine our inquiry to the *personal* knowledge of agent Fredericks, but rather may consider the *collective* knowledge of all of the agents involved in the investigation and surveillance.

Agent Fredericks testified that he conferred with agent Lackey for approximately half an hour and relied "to a great degree" on Lackey's opinion in deciding to make the arrests. Agent Nielsen had communicated to Lackey his observations of Brock's breathing difficulties, and the conversation Nielsen overheard indicating that the defendants knew they were under surveillance. Fredericks was aware that both Lackey and Nielsen were of the opinion that the occupants of the motor home were manufacturing methamphetamine. In effect all of them participated in the decision to make the arrests.

Fredericks, Lackey and Nielsen were all experienced DEA agents familiar with methods employed in the manufacture of illicit drugs. Their experience may properly be considered in determining whether they had probable cause to make the arrests. "Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *Davis v. United States*, 409 F.2d 458, 460 (D.C.Cir.) *cert. denied*, 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969). "The test is whether ordinary, reasonable men, possessed of the experience and knowledge of [the arresting officers] would conclude that the transaction . . . was more likely than not a criminal transaction." *United States v. Wabnik*, 444 F.2d 203, 205 (2 Cir.) *cert. denied*, 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971).[26]

■ The collective knowledge of agents Fredericks, Lackey and Nielsen was sufficient to constitute probable cause. While no one event, considered in isolation, would be sufficient, the "succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." *United States v. Patterson*, 492 F.2d 995 (9 Cir.), *cert. denied*, 419 U.S. 846, 95 S.Ct. 82, 42 L.Ed.2d 75 (1974).

■ There remains for consideration the question of whether agent Fredericks could rely upon information known to agents Lackey and Nielsen which had not been communicated to Fredericks. In *United States v. Stratton*, 453 F.2d 36, 37 (8 Cir.), *cert. denied*, 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972), the court held that secret service agents who made warrantless arrests were not required at the moment of arrest to possess personal knowledge of all the facts and circumstances, but rather that probable cause was "to be determined upon the objective facts available for considera-

25. When Brown informed the police that Bernard manufactured methamphetamine, he told the police that he had taught Bernard how to "cook" the drug. Thus, it would seem plausible that Bernard might be present at the lab.

26. See also *Bell v. United States*, 254 F.2d 82, 85–86 (D.C.Cir. 1958); *United States v. Davis*, 458 F.2d 819, 822 (D.C.Cir. 1972).

tion by the agencies or officers participating in the arrest . . . ." The court said:

> We think the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause. The arresting officer himself need not possess all of the available information. As stated in *Stassi v. United States*, 410 F.2d 946 (5 Cir. 1969). "The officers involved were working in close concert with each other and the knowledge of one of them was the knowledge of all."

We recognize that in some of the cases holding that the collective knowledge of the arresting officers could be considered in determining probable cause, the substance of information obtained by other officers had been communicated to the arresting officers. See, *e. g., United States v. Pitt*, 382 F.2d 322 (4 Cir. 1967). We do not find, however, that this is required, particularly where, as here, the agents were working in close concert. Moreover, as noted *supra*, agent Fredericks relied to "a great degree" on the opinion of agent Lackey in making the final decision to effect the arrests.[27]

We recognize also that "the standards applicable to the factual basis supporting the officer's probable-cause assessment at the time of the challenged arrest and search are at least as stringent as the standards applied with respect to the magistrate's assessment." *Whiteley v. Warden*, 401 U.S. 560, 566, 91 S.Ct. 1031, 1036, 28 L.Ed.2d 306 (1971); *accord United States v. Fernandez-*

*Guzman*, 577 F.2d 1093, 1097 (7 Cir.), *cert. denied*, 439 U.S. 954, 99 S.Ct. 351, 58 L.Ed.2d 345 (1978). In *Whiteley*, a sheriff, acting on a tip, obtained a warrant from a magistrate. A police radio bulletin described the suspects, automobile, and money taken in a burglary. Relying on the radio bulletin, an officer in another county made a warrantless arrest and search. The complaint had not mentioned that the sheriff was acting on an informant's tip and had no information to corroborate the tip. The Court held that under these circumstances the police radio bulletin could not support the element of probable cause that the officer who issued the bulletin lacked. The Court noted, however, that police officers are entitled to rely on radio bulletins that are based on probable cause.[28]

In *United States v. Gaither*, 527 F.2d 456 (4 Cir. 1975), *cert. denied*, 425 U.S. 952, 96 S.Ct. 1728, 48 L.Ed.2d 196 (1976), a warrantless arrest was made by a police officer on a radio bulletin "based on personal observation by the FBI, not on an informant's tip alone." In distinguishing *Whiteley v. Warden*, the Court said:

> The Court (in *Whiteley*) noted that officers are entitled to rely on radio bulletins that *are* based on probable cause "can rest upon the *collective* knowledge of the police, rather than solely on that of the officer who actually makes the arrest." (Citing *United States v. Pitt, supra*.)

Similarly, agent Fredericks was entitled to rely on the observations and knowledge of agents Lackey and Nielsen, even though some of the critical information had not been communicated to him.

---

**27.** Other cases holding that the collective knowledge of the arresting officers may be considered in determining probable cause include *United States v. Caraballo*, 571 F.2d 975, 977 (5 Cir. 1978); *United States v. Rose*, 541 F.2d 750, 756 (8 Cir. 1976), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); *Moreno-Vallejo v. United States*, 414 F.2d 901, 904 (5 Cir. 1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970); *United States v. Heisman*, 503 F.2d 1284 (8 Cir. 1974) n. 5 at page 1290.

**28.** The Court said:
We do not of course, question that the Laramie police were entitled to act on the

strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.
*Id.*, 401 U.S. at 568, 91 S.Ct. at 1037.

*Conclusion*

We conclude that (1) the district court erred in suppressing agent Nielsen's testimony at the pretrial suppression hearing; (2) the destruction of Nielsen's rough surveillance notes will not preclude his testifying at the trial with respect to his observations prior to the arrests at Hat Rock State Park; (3) the collective knowledge of DEA agents Fredericks, Lackey and Nielsen may be considered in determining whether there was probable cause for the arrests; and (4) based on that collective knowledge, there was probable cause to effect the arrests.

Reversed and remanded for further proceedings consistent with this opinion.