**UNITED STATES of America**

v.

**Paul WISEMAN.**

**Crim. No. 85–479–W.**

United States District Court,
D. Massachusetts.

April 15, 1986.

Karnig Boyajian, Boston, Mass., for defendant.

William H. Kettlewell, Asst. U.S. Atty., D. of Mass., Boston, Mass., for plaintiff.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Defendant Paul Wiseman was arrested on December 4, 1985, shortly after the arrest of his now co-defendant, an individual known as Melvin Smith. A subsequent search of Wiseman disclosed that he was in possession of approximately 25 bags of heroin. On December 19, 1985, Wiseman was indicted with Smith and Otis Glenn for conspiracy to distribute heroin and possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

On January 21, 1986, Wiseman filed a motion to suppress the evidence obtained in the search following his arrest. He contends the arrest was without a warrant and without probable cause. Thus, he asserts that the subsequent search violated his rights established by the Fourth Amendment of the United States Constitution.

The court commenced an evidentiary hearing on March 4, 1986, which was continued and concluded on March 11, 1986 (the "Suppression Hearing"). Drug Enforcement Agency ("DEA") Special Agents Reginald Tillery, Guadulupe Aguylar and Kathleen Bennett, as well as the defendant,

testified at the Suppression Hearing. The transcript of Wiseman's December 6, 1985 detention hearing was also made part of the record of the Suppression Hearing.

For the reasons stated below, the court finds that the probable cause requirement of the Fourth Amendment was satisfied at the time of Wiseman's arrest. Defendant's motion to suppress is, therefore, denied.

### Findings of Facts

The court finds that the government has proven the following facts by a preponderance of the evidence.

Prior to December 3, 1983, Tillery and other DEA Special Agents were conducting an undercover investigation in Roxbury, Massachusetts which had resulted in several sales of heroin by Smith and Glenn to Tillery. Transcript of March 4, 1986 Suppression Hearing at 7 (hereinafter "Tr. at ____;" the transcript of the March 11, 1986, session of the Suppression Hearing is hereinafter cited as "Tr. at 2-____"); transcript of December 6, 1985 Detention Hearing at 6 to 15, (hereinafter "Detention Tr. at ____"). Tillery made plans to meet with Smith on the afternoon of December 3, 1985, at a Howard Johnson's restaurant in Dorchester, Massachusetts to arrange for the purchase of more heroin. Tr. at 4, 5, 10, 2-74 to 2-76. Tillery was at the restaurant when Smith arrived with Wiseman. Tr. at 6. Tillery had not seen or met Wiseman before. Tr. at 29.

Smith introduced Wiseman to Tillery as "Mac" and told Tillery that Mac had been brought to Boston from New York City to help distribute heroin because the business had been so good. Tr. at 6 to 10, 35. Wiseman silently acknowledged this introduction. Tr. at 33, 35. Wiseman had indeed moved to Boston from New York City several weeks before this meeting. Tr. at 2-90.

In Wiseman's presence, Tillery and Smith discussed the purchase by Tillery of two ounces of heroin for $29,000. Tr. at 10; Detention Tr. at 16. They said they would meet after about 1:30 p.m. the next day, at the same place, to exchange Tillery's cash for Smith's heroin. Tr. at 10, 11. Wiseman, who was sitting next to Smith throughout this conversation, did not say anything. Tr. at 11.[1]

Tillery then took Smith out to a car in the parking lot. Tr. at 2-13. Bennett, posing as Tillery's girl friend, was in the car. Tr. at 2-11, 2-12. She had seen Wiseman arrive with Smith in a taxicab. Tr. at 2-12. When Tillery and Smith were at the car, Bennett showed Smith $15,000 in cash. Tr. at 2-13.

Tillery and Bennett then drove away. Tr. at 2-15. Tillery told Bennett that Smith had introduced the other man as "Mac," who was brought up from New York City to help with the heroin distribution in Boston because the business was getting so much bigger. Tr. at 2-15, 2-29. Tillery also told Bennett of the conversation which had taken place in Wiseman's presence concerning the delivery of two ounces of heroin the next day. Tr. at 2-15.

On December 4, 1985, Tillery and Smith spoke by telephone and arranged to meet at the Howard Johnson's at 2:30 p.m. that afternoon. Tr. at 12. Smith told Tillery that Glenn or someone else might be with him. Tr. at 82, 89, 90.

With the approval of his supervisor, Tillery decided to conclude the undercover operation by arresting Smith with the heroin he was expected to bring that day. Tr. at 80. An arrest warrant was obtained for Glenn to permit his capture before he could flee if he was not with Smith that afternoon. Tr. at 48. Tillery did not then seek to obtain an arrest warrant for Wiseman because he had not made a buy from Wiseman and regarded him as a person periph-

---

[1]. Wiseman testified that he was with Smith on December 3, 1985, but that he was only introduced as "Mac." Tr. at 2-74. He denied that there was any discussion of heroin, or "junk," or "stuff," as heroin was sometimes called, in his presence. Tr. 2-78, 2-79. Having considered the other relevant evidence and the demeanor of the witnesses, the court does not find the foregoing testimony of Wiseman to be credible.

erally involved in the conspiracy who was unlikely to be prosecuted by the federal government if he did not reappear with Smith that day. Tr. at 49.

Also on the morning of December 4, 1985, Tillery met with the other DEA Special Agents and a Boston Police Officer who would be on the surveillance and arrest team that afternoon. Tr. at 81. These include Special Agents Mangione, Bennett, Aguylar, Connolly, Lemon, Swidwinski, Aserian, and Alexander, as well as Boston Police Officer Duane. Tr. at 81 to 82. Tillery explained that he and Bennett would be in the restaurant waiting for Smith to bring the heroin. Tr. at 82. He said Smith was expected to bring another person with him and described Glenn and Wiseman. Tr. at 28, 82, 83, 2–18, 2–29. Tillery told the others that he would take Smith into the bathroom to see the heroin. Tr. at 83. When he came out, he would tie his shoelace to indicate that he had seen the heroin, and that he would take Smith out to the parking lot to arrest him. Tr. at 83. This signal would also indicate that the other agents were to arrest anyone with Smith. Tr. at 16, 83.

Based on Tillery's briefing, Bennett anticipated that Smith would be accompanied by another man. Tr. at 2–18, 2–31 to 2–34. Bennett understood that one of the men described by Tillery was Wiseman, an individual she had seen and discussed with Tillery the day before. Tr. at 2–18 to 2–19, 2–31 to 2–34. She expected that Wiseman would probably be the person accompanying Smith. Tr. 2–32 to 2–34.

After the briefing, Aguylar, however, understood only that another man was expected to accompany Smith and, if the shoelace signal was given, he was to be arrested after Tillery took Smith to the parking lot. Tr. at 67 to 70. She did not, on December 4, 1985, know Wiseman by face or by any other physical description. Tr. at 67.

Before 2:30 p.m. on December 4, 1985, Tillery and Bennett went to the Howard Johnson's Tr. 12, 2–20. The surveillance and arrest team was also there. Tr. at 13. At about 2:45 p.m., Smith arrived alone and joined Tillery and Bennett in a booth. Tr. at 12, 13, 2–21. Smith indicated he had brought the heroin. Tr. at 14, 2–21. Tillery suggested they go into the men's room to inspect the heroin. Tr. at 15, 2–21. In the men's room Smith gave Tillery the bag and Tillery was satisfied Smith had indeed brought the heroin. Tr. at 15.

As they were walking back to the booth, Tillery gave the arrest signal by tying his shoelace. Tr. at 15, 2–22. After a short time in the booth, Tillery suggested to Smith that they go outside to do the deal. Tr. 16, 2–22.

As Smith and Tillery were leaving the restaurant, Wiseman came in and joined them. Tr. at 16, 2–22. Tillery said that he did not want Wiseman to go out to the car with them when they did the deal. Tr. at 16. Smith told Wiseman to sit with Bennett while he and Tillery took care of business. Tr. at 16, 17, 88. Tillery pointed to Bennett, who waved. Tr. 2–22. Wiseman joined Bennett. Tr. at 58. At this point Tillery knew that by virtue of the signal given earlier, Wiseman would soon be arrested. Aguylar properly attached significance to the fact that Wiseman sat with Bennett. Tr. at 69, 71.

After Wiseman was in the booth with Bennett for a short time, Aguylar and Duane approached them. Tr. at 58, 2–23. Bennett leaned across the table and put her hands on Wiseman's wrists. Tr. at 2–24. Aguylar identified herself, displayed her badge and told Wiseman he was under arrest. Tr. at 58, 2–24. Duane handcuffed Wiseman. Tr. at 2–24. This method of arrest was used because Tillery did not want Bennett, a female agent, to attempt to arrest a male alone; he was afraid that she might be overpowered and she and patrons of the restaurant might be harmed by the guns the conspirators were expected to have. Tr. at 84. Bennett patted Wiseman down to determine if he had any weapons. Tr. at 59. After being transported to DEA headquarters by Connolly and Aguylar, Wiseman was strip searched by Connolly. Tr. at 59. Approximately twenty-five packets of heroin were found inside Wise-

man's undershorts. Tr. at 59, Detention Tr. at 21. It is this evidence Wiseman now seeks to suppress.

### Conclusions of Laws

Defendant asserts that he was arrested without a warrant and without probable cause. He further contends that the search incident to his purportedly unlawful arrest violated his Fourth Amendment rights and, therefore, the fruits of that search may not be used as evidence against him. The government responds that the arrest satisfied the probable cause requirement of the Fourth Amendment and that suppression of the evidence discovered in the search incident to that arrest would be improper. The government has borne its burden of proving its contention to be correct.

As the Court of Appeals for the Ninth Circuit has stated:

An arrest without a search warrant and a reasonable search incident to the arrest are valid if the arrest is based on probable cause. The test of probable cause is whether at the moment of arrest the facts and circumstances within the knowledge of the arresting officers "and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 [85 S.Ct. 223, 225, 13 L.Ed.2d 142] (1964) ... See also, *United States v. See*, 505 F.2d 845, 854–55 (9th Cir.1974), *cert. denied*, 420 U.S. 992 [95 S.Ct. 1428, 43 L.Ed.2d 673] (1975). "In applying these standards [the court] must consider *all* the facts known to the officers and consider *all* the reasonable inferences that could be drawn from them before the arrest." *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir.), *cert. denied*, 421 U.S. 967 [95 S.Ct. 1958, 44 L.Ed.2d 455] (1975) (emphasis in text). If the officers have probable cause to make the arrest it is not necessary to prove exigent circumstances to justify a warrantless arrest. *United States v.*

*Watson*, 423 U.S. 411, 423 [96 S.Ct. 820, 827–828, 46 L.Ed.2d 598] (1976).

*United States v. Bernard*, 623 F.2d 551, 558–59 (9th Cir.1979).

As set forth below, Tillery and Bennett each had probable cause to arrest Wiseman. Tillery, in effect, ordered the arrest and Bennett both permitted and participated in the arrest. Aguylar did not alone have probable cause to arrest Wiseman. She was, however, working closely in concert with Tillery and Bennett and following Tillery's direction when she informed Wiseman he was under arrest. Thus, the probable cause requirement of the Fourth Amendment is met. *Bernard*, 623 F.2d at 561; *United States v. Calhoun*, 542 F.2d 1094, 1100 (9th Cir.1976), *cert. denied sub nom. Stephenson v. United States*, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); *United States v. Woods*, 544 F.2d 242, 259 (6th Cir.1976), *cert. denied sub nom. Hurt v. United States*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977), and *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), and *cert. denied sub nom. Kilpatrick v. United States*, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270 (1977).

■ The court's conclusion that Tillery had probable cause to arrest Wiseman when he reappeared on December 4, 1985, rests primarily on the following facts. On December 3, 1985, Wiseman was introduced to Tillery as a member of the heroin distribution ring and sat quietly while Smith and Tillery negotiated a sale of heroin for the next afternoon. The Federal Rules of Evidence indicate that silence under circumstances in which an innocent person would normally be induced to respond may be regarded as an admission. Federal Rule of Evidence 801(d)(2)(B). Wiseman's silent acknowledgement when introduced as a member of the distribution ring would probably constitute an adoptive admission at trial. *United States v. Alvarez-Porras*, 643 F.2d 54, 58 (2d Cir.), *cert. denied sub nom. Garcia-Perez v. United States*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); *United States v. Moore*, 522 F.2d 1068, 1075–76 (9th Cir.1975), *cert. denied*,

423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). In any event, Wiseman's response to the introduction and continued presence while the deal was arranged on December 3, 1985, made it reasonable for Tillery to believe he was, as represented by Smith, a member of the conspiracy. Moreover, in Wiseman's presence, Smith and Tillery agreed to meet to conclude the deal the following afternoon. On the morning of December 4, 1985, Smith told Tillery he would probably bring someone with him for the consummation of the transaction that afternoon. When Wiseman re-appeared in the midst of that deal, a prudent man would certainly have been warranted in believing that he was a conspirator in the heroin distribution scheme. Thus, Tillery then had probable cause to arrest Wiseman personally.[2]

At this point, Tillery was in effect quarterbacking the evolving undercover operation. It had originally been assumed that Smith and his colleague would arrive together. Tillery's plan, communicated to his colleagues, was to separate them before effecting the arrests. Wiseman's appearance later than anticipated required an adjustment to accomplish the desired separation. Thus, Tillery objected to Wiseman going outside with him and Smith, but permitted Smith to ask Wiseman to join Bennett and facilitated implementation of this diversion by pointing her out. In view of the arrest plan and the signal Tillery had already given, Tillery knew that Wiseman would be arrested after joining Bennett. Tillery's actions had the purpose and effect of causing Wiseman's arrest. He had probable cause to do so.

■ Bennett also had probable cause to arrest Tillery herself. Her observations of Wiseman on December 3 and 4, 1985, and what Tillery had told her in the car on December 3 and in the briefing on December 4, caused her to have information concerning Wiseman which was comparable to Tillery's. The information she received from Tillery was trustworthy and a prudent person in her position when Wiseman joined her would have reasonably believed he was a member of the conspiracy. If she had not believed this, she could have prevented Wiseman's arrest. She evidently felt, however, that Wiseman's arrest was legally justified and appropriate for she participated in it rather than stopping it.

Wiseman contends that even if Tillery or Bennett had probable cause to arrest him, Aguylar was the arresting officer and she did not. Aguylar admits she would have arrested any black man who joined Smith. Tr. 66 to 69. She did not recognize Wiseman, nor did she recall him being described by Tillery. Tr. at 67. Thus, Wiseman argues that she did not personally have probable cause to arrest him and, therefore, the arrest violated his Fourth Amendment rights. This contention is, however, incorrect for several reasons.

First, Aguylar was not alone the arresting officer in this case. While Aguylar informed Wiseman he was under arrest, Bennett, who personally had probable cause, secured his hands.

Second, in informing Wiseman he was under arrest Aguylar was acting at the direction of Tillery, who had probable cause to make or direct the making of that arrest. When Tillery diverted Wiseman from going to the parking lot, agreed to Smith's suggestion that Wiseman join Bennett, and pointed her out to Wiseman, he was communicating to Aguylar that Wiseman was with Smith and should be arrested. Aguylar properly attached significance to the fact that Wiseman sat with Bennett. This resulted in his arrest.

■ When, as here, the officer directing that an arrest be made has determined that probable cause exists to believe an individual is involved in a crime, it does not matter that the officer making the arrest neither observed the defendant in criminal activity,

---

**2.** The court notes that it probably would have been dangerous for Tillery to attempt to arrest Wiseman and Smith simultaneously himself or to return after arresting Smith to arrest Wiseman himself. The arrest plan was apparently formulated to reduce the inherent danger to the agents and to members of the public. Tr. at 84.

nor knows the facts underlying the determination that probable cause exists. *United States v. Calhoun,* 542 F.2d at 1100; *United States v. Woods,* 544 F.2d at 260 ("When a superior officer orders another officer to make an arrest, it is proper to consider the superior's knowledge in determining whether there was probable cause"). Assuming Agulyar was alone the arresting officer, this case is analogous in some respects to *Woods.* In *Woods* an arrest of the defendant Hurt was made pursuant to a general order to arrest "anyone" leaving a particular address on a specified evening. *Woods,* 544 F.2d at 259–260. As the officer giving the order had probable cause to believe anyone then leaving that address was engaged in narcotics offenses, the arrest of Hurt was not invalid. *Woods,* 544 F.2d at 260. In contrast to the present case, in *Woods* it appears that the officers with knowledge of the facts establishing probable cause were not at the scene with the arresting officer. Thus this is a stronger case than *Woods* for finding that the requirements of the Fourth Amendment have been met.

 Finally, it is inappropriate to focus on Aguylar alone, or any other officer alone, in determining whether Wiseman's Fourth Amendment rights were violated. As the facts found earlier demonstrate, this is a case in which a number of agents were working in close concert with each other in the surveillance and arrests of Smith and Wiseman. In such cases, the agents who effect the arrest need "not possess personal knowledge of all of the facts and circumstances, but rather ... probable cause is 'to be determined upon the objective facts available for consideration by the agencies or officers participating in the arrest....'" *Bernard,* 623 F.2d at 561–62, *quoting United States v. Strat-*

ton, 453 F.2d 36, 37 (8th Cir.), *cert. denied,* 405 U.S. 1069, 92 S.Ct. 1515, 31 L.Ed.2d 800 (1972). In some such cases, the substance of the information establishing probable cause has been communicated to the arresting officer. *See e.g., United States v. Impson,* 482 F.2d 197, 199 (5th Cir.), *cert. denied,* 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973). However, this court concurs with the Ninth Circuit Court of Appeals decision in *Bernard* in finding that this is not required where, as here, the agents were working in close concert. *Bernard,* 623 F.2d at 561. Rather, as the Fifth Circuit Court of Appeals has stated, where "the officers involved were working closely with each other ... the knowledge of one of them was the knowledge of all." *Stassi v. United States,* 410 F.2d 946, 952 n. 7 (5th Cir.1969).

 In this case, Aguylar was working closely with Tillery and Bennett, who each had probable cause to arrest Wiseman.[3] She was entitled to rely on Tillery particularly. Thus, the plan conceived and orchestrated by Tillery resulted in the legally justified arrest of Wiseman.

### Conclusion

For the foregoing reasons, the court finds that the arrest and subsequent search of Wiseman did not violate his Fourth Amendment rights. The motion to suppress is, therefore, DENIED.

---

3. The present case, in which two agents on the scene had probable cause to make personally an arrest arguably effected by a colleague working in close concert with them, is distinguishable from cases in which evidence has been found to have been improperly obtained because at the time of arrest the officers, individually or collectively, did not have probable cause for it. *See*

*Whitely v. Warden Wyoming State Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *United States v. Webster,* 750 F.2d 307, 323 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) and *cert. denied sub nom. Murphy v. United States,* 471 U.S. 1106, 105 S.Ct. 2341, 85 L.Ed.2d 856 (1985).