**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Raymond Medeiros FREITAS,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael E. BUSTER,**
**Defendant-Appellant.**

**Nos. 80–1689, 80–1718.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 15, 1981.

Withdrawn from Submission
Nov. 23, 1981.

Resubmitted June 11, 1982.

Decided April 25, 1983.

As Amended Sept. 26, 1983.

Sanford Svetcov, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Spencer W. Strellis, Oakland, Cal., and Richard P. Duane, Duane, Lyman & Seltzer, Berkeley, Cal., for defendants-appellants.

Before FLETCHER and CANBY, Circuit Judges, and COPPLE,* District Judge.

FLETCHER, Circuit Judge:

Following a trial on stipulated facts, appellants Buster and Freitas were convicted of violations of 21 U.S.C. § 846 (conspiracy to distribute cocaine) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute cocaine). The compelling evidence in support of these convictions consisted of cocaine seized from a wicker basket found in the rear of a vehicle owned by Buster, and an additional amount seized from the inside of a piece of furniture that was stored in a rental storage space rented by Freitas. The significant question on appeal is whether this evidence was obtained illegally by the Government and should have been suppressed. The district court denied the appellants' motion to suppress. We conclude that although the suspicions of the federal officers whose warrantless search led to the discovery of incriminating evidence were not altogether unreasonable, they did not amount to probable cause to search, and therefore we reverse.

I

FACTS

On May 29, 1980, appellants Freitas and Buster were arrested by FBI agents after they had stepped out of a Chevrolet van parked in the driveway of the residence of Elizabeth Kathleen Gray in Santa Rosa, California. Immediately following the arrest, the agents looked inside the rear of the van, where they found several sausage-shaped packages inside a wicker basket. The agents opened one package and found cocaine. In all, 2,610 grams of cocaine were in the packages. Later, FBI agents obtained warrants that led to the discovery of an additional 266 grams of cocaine and other drug paraphernalia. Because all of the evidence was discovered as a fruit of the search of the Chevrolet van outside the Gray residence, the critical question is whether the information known to the agents at the time of arrest amounted to probable cause to believe that the van contained evidence of criminal activity. All of this information was recited in an affidavit given by Special Agent Thomas J. Barrett after discovery of the cocaine, and may be summarized as follows.

In February, 1978, a "confidential source," who had "provided information in the past which resulted in at least fifteen indictments being issued in Federal cases," stated that Raymond Giarusso and a person named "Mike" were importing narcotics using a furniture company as a cover. The confidential source indicated that "Mike" lived in Concord, California.

Using telephone toll records and motor vehicle registration information, the FBI determined that Giarusso spoke frequently with Michael Buster, who lived in Pleasant Hill, California. A Concord police officer told the FBI that Buster had been a "subject of investigation" for narcotics distribution. A California Highway Patrolman stated that Buster worked as a salesman for a Cadillac dealership in Hayward, California, that he had seen Buster and Giarusso together on a number of occasions, and that Giarusso often drove Cadillacs supplied by Buster.

---

* The Honorable William P. Copple, United States District Judge for the District of Arizo-    na, sitting by designation.

A second, unrelated informant, described by Agent Barrett as "a well-known associate of organized crime figures, who has furnished reliable intelligence information regarding organized crime figures that has been corroborated by independent investigation," advised agents in July, 1978, that three individuals known as "Mike, Willie and Ray" were importing narcotics using a furniture company as a cover. This second source stated that Ray now owned a T.V. store in Hayward but was formerly a driver for Global Van Lines. He also stated that Mike, Willie, and Ray had used Global to deliver narcotics shipments. When presented with the names of Michael Buster, William Morter, and Raymond Freitas, the informant said they were the people to whom he had referred. Freitas was a T.V. store owner and was a former Global driver.

The FBI monitored records of Global Van Lines and the U.S. Customs Service. These records indicated that Freitas had received two shipments of furniture from Peru in 1979, the year after the second informer tip was received.

In July, 1979, officials of Global advised agents that Freitas had requested delivery of a container of furniture to Pacheco, California from the Port of San Francisco. Surveillance of the Pacheco address was set up on the date of delivery. A Global Van Lines truck was seen to arrive with a large container which Freitas and Earl James Link, Jr., helped the driver unload. Freitas and Link were later seen departing with two pillow-type bags. These bags were believed by the surveilling agents to contain narcotics.

The second confidential source was contacted regularly between September, 1979 and February, 1980. He indicated that Buster, Morter, and Freitas were still involved in narcotics importation but had switched to another moving company. The name of the new moving company was not known to the source.

On May 20, 1980, Global informed agents that Freitas had requested delivery of another container of furniture. The furniture container was later located in a warehouse in Oakland, California. Customs agents, alerted to the possibility that drugs might be included in the shipment, carefully[1] checked the container, and found no evidence of drugs.

On May 29, 1980, a Global Van Lines truck picked up the furniture container and was followed to Santa Rosa, California, where the truck was met by Freitas and Link, driving in a blue Mercedes, who then escorted the truck to 3075 Coffee Lane, warehouse space # 5. Freitas and Link unloaded the truck and left. They returned, approximately 45 minutes later, in a grey BMW. They made several drives through the area over the course of the next hour.

Thereafter, Freitas and Buster were observed at the Coffee Lane warehouse space loading furniture items into a Chevrolet van. The van departed with Buster driving; Freitas remained at the warehouse. The van was observed taking a circuitous route through the area, which the surveilling agents characterized as evasive driving designed to prevent surveillance. Eventually the van returned to the warehouse. Buster and Freitas were observed placing a large wicker basket in the rear of the van. They then drove to the Santa Rosa home of Elizabeth Kathleen Gray. FBI agents who had followed arrested Freitas, Buster, and Gray in front of the house, then looked in the back of the van, where they found packages of cocaine in the wicker basket.

## II

## ANALYSIS

A. *Standing.*

■ The Government contends that appellant Freitas has failed to show that he

---

1. Agent Barrett's affidavit described this customs search as "cursory." However, the Government now admits that the search was in fact "careful" and made with knowledge of the ongoing FBI investigation. *See* Appellee's Brief at 5. This careful search apparently yielded no corroborating evidence of drug smuggling of any kind, although the customs agents refrained from cutting open the upholstered furniture that was contained in the shipment.

has standing to challenge the search of the vehicle driven by Buster. This argument was initially raised by the Government in its response to the defendants' motion to suppress at trial. The trial court, however, limited the scope of the hearing on the suppression motion to two issues: the nature of the wicker basket and the missing first page of the affidavit in support of the subsequent search warrants. At one point during the hearing, counsel for Buster attempted to broach the subject of standing. The court refused to hear any testimony concerning standing or to receive any offer of proof relevant to standing, stating that it "was not interested in," and "wouldn't have heard this testimony if there was any question of standing."

Recent cases decided in this circuit suggest that the defendant seeking to suppress evidence on fourth amendment grounds must in every instance first establish that he had a legitimate expectation of privacy in the place where the allegedly unlawful search occurred.[2] At the suppression hearing, counsel for Freitas had no opportunity to present evidence that would establish his

expectation of privacy in the van. We remand his case for a hearing to address that issue. *United States v. Lomas*, 706 F.2d 886, 895 (9th Cir. 1983).

■ Furthermore, to deny the appellant standing when he was not permitted to offer his evidence on the issue would be to deny him a fair hearing.

B. *Probable Cause.*

■ The warrantless search of the van driven by Buster can be upheld only if supported by probable cause.[3] *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 2164, 72 L.Ed.2d 572 (1982). In determining whether the FBI had probable cause to search the rear of the van, we must consider whether at the time of the search " 'the facts and circumstances within [the agents'] knowledge and of which they had reasonably trustworthy information [were] sufficient in themselves to warrant a man of reasonable caution in the belief that' an item subject to seizure" would be found in the van. *United States v. Garza-Hernan-*

---

**2.** In *United States v. Nadler,* 698 F.2d 995 (9th Cir.1983), this court affirmed the district court's refusal to suppress evidence on standing grounds even though the Government failed to challenge the defendants' standing below, and in *United States v. Perez,* 644 F.2d 1299, 1303–04 (9th Cir.1981), we remanded the case to the district court for a determination as to whether the defendants had standing to raise a fourth amendment claim even though the Government did not raise the issue in district court. In each of these cases, we reasoned that a defendant seeking to assert a fourth amendment challenge bears the burden of showing some legitimate expectation of privacy in the area searched, under the rule of *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). Where a defendant fails to meet this burden in the suppression hearing, he cannot prevail on appeal even though the Government also did not establish the contrary, unless, of course, the record on appeal independently demonstrates the requisite standing. *See Nadler,* 698 F.2d at 999–1000; *Perez,* 644 F.2d at 1303–04.

**3.** The standard for assessing the legality of the warrantless arrest of the appellants in this case

is identical to the standard we use to evaluate the legality of the search: the arrest was legal only if based upon probable cause. *See United States v. Watson,* 423 U.S. 411, 417–18, 96 S.Ct. 820, 824–825, 46 L.Ed.2d 598 (1976). Because the FBI agents did not accumulate any additional incriminating evidence between the time they arrested the appellants and the time they searched the van, we have no need independently to decide the question whether the agents had probable cause to arrest. The search here was not a "fruit" of the arrests, as it would have been had the arrests or a search incident to the arrests supplied probable cause to search the van. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Likewise, the van search cannot itself be justified as a search incident to the arrests. *See New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981); *see also Coolidge v. New Hampshire,* 403 U.S. 443, 455–57, 91 S.Ct. 2022, 2032–33, 29 L.Ed.2d 564 (1971). Under the peculiar circumstances of this case, therefore, we need focus only upon the degree of cause supporting the vehicle search that yielded incriminating evidence.

*dez,* 623 F.2d 496, 499 (7th Cir.1980) (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949)). To determine that probable cause existed, we must conclude that "criminal activity was probably shown" by such facts and circumstances. *See United States v. Tate,* 694 F.2d 1217, 1221 (9th Cir.1982); *United States v. Traylor,* 656 F.2d 1326, 1330 (9th Cir.1981).

The primary evidence of criminal activity relied upon by the FBI agents to justify their search in this case was the hearsay information provided by informants. All of the other surveillance observations and results of investigation recited by Agent Barrett in his affidavit were innocuous, and did not establish cause to suspect criminal activity except insofar as they tended to corroborate the informant reports.[4] Under these circumstances, we must apply the test developed by the Supreme Court in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) for assessing whether and when an informant's statement may be deemed credible enough to serve as a basis for probable cause to search.

■ The first part of this test focuses on whether known underlying circumstances show how the informant obtained his information. *See United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct. 2075, 2079, 29 L.Ed.2d 723 (1971) (plurality opinion); *Spinelli v. United States,* 393 U.S. at 416, 89 S.Ct. at 589. If from the report it is apparent that the informant spoke with personal knowledge, then the information is usually deemed reliable enough to support a finding of probable cause. *See, e.g., United States v. Harris,* 403 U.S. at 581, 91 S.Ct. at 2080 (plurality opinion); *United States v. Chesh-*

*er,* 678 F.2d 1353, 1359 (9th Cir.1982); *see also Aguilar v. Texas,* 378 U.S. at 113, 84 S.Ct. at 1513. Also, the report can be considered trustworthy enough to establish probable cause when the circumstances in which the informant gave the statement themselves provide sufficient indicia of reliability. *See, e.g., United States v. Harris,* 403 U.S. at 583–84, 91 S.Ct. at 2081–82 (plurality opinion) (informant made declaration against penal interest); *United States v. Jackson,* 544 F.2d 407, 411 (9th Cir.1976) (informant was suspect's mother-in-law, who lived in the same house with him). *See also United States v. Beusch,* 596 F.2d 871, 874 (9th Cir.1979) (informant was U.S. Customs Service agent, and government investigatory agents are entitled to a presumption of credibility). However, where neither personal knowledge of the informant nor any other intrinsic basis for crediting the informant's report are present, the hearsay statement fails the first "prong" of the *Spinelli* test. *See, e.g., United States v. Traylor,* 656 F.2d 1326, 1330 (9th Cir.1981); *Satchell v. Cardwell,* 653 F.2d 408, 411 (9th Cir.), *cert. denied,* 454 U.S. 1154, 102 S.Ct. 1026, 71 L.Ed.2d 311 (1982); *see also Spinelli v. United States,* 393 U.S. at 425, 89 S.Ct. at 593 (White, J., concurring) ("If the [warrant] affidavit rests on hearsay—an informant's report—what is necessary under *Aguilar* is one of two things: the informant must declare either (1) that he has himself seen or perceived the fact or facts asserted; or (2) that his information is hearsay, but there is good reason for believing it—perhaps one of the usual grounds for crediting hearsay information.").

■ Neither of the informant tips relied upon by the FBI agents in this case contained sufficient indications of reliability to meet the first part of the *Spinelli* test.

---

4. The only information uncovered during the background investigation that was not in itself innocuous was the statement by Concord police that Buster had been a "subject of investigation" for narcotics offenses. However, this simple assertion of police suspicion could not be used to lend additional weight to information otherwise insufficient to establish probable cause. *Spinelli v. United States,* 393 U.S. 410, 418–19, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

There was no assurance that either source had gathered his information from personal observation rather than "casual rumor." Cf. *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589. The only direct evidence of credibility recalled by Agent Barrett was the fact that both informants had previously provided tips that were to some degree reliable. However, this alone is not enough to satisfy the first part of the *Spinelli* test. *See United States v. Hamilton,* 490 F.2d 598, 600–01 (9th Cir.), *cert. denied,* 419 U.S. 880, 95 S.Ct. 145, 42 L.Ed.2d 120 (1974). Therefore, it is necessary to move to the second part of the *Spinelli* formula, which considers other evidence that tends to corroborate the informant's statement. The test is whether it can "fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar*'s [credibility-reliability] tests without independent corroboration." *Spinelli,* 393 U.S. at 415, 89 S.Ct. at 588.

■ The first tip received by the FBI agents plainly cannot meet this test. The only person definitely identified in the tip was Raymond Giarusso; Agent Barrett did not report any further evidence linking Giarusso with either Freitas and Buster or with the suspected drug importation scheme. The hypothesis that the "Mike" named by the informant was Michael Buster was strictly conjecture on the part of the agents, and was not confirmed by the informant. The only real corroboration the first tip received was the second tip, that also described a drug import scheme relating to a furniture business.[5] This was insufficient corroboration to show the agents' interpretation of the informant's story trustworthy enough to supply probable cause to arrest Buster and Freitas or to search their vehicle. The first tip was still relevant, however, because its details concerning the name "Mike" and the furniture company cover tended to corroborate the information given in the second tip.

■ Probable cause was supplied, if at all, by the information given the FBI by the second confidential source. This information consisted of the following items: (1) three individuals named Mike, Willie, and Ray, whom the informant later identified as Michael Buster, William Morter, and Raymond Freitas, were heavily involved in narcotics importation; (2) a furniture company was being used as a cover for the operation; (3) the narcotics were imported on commercial shipping vessels; and (4) the narcotics were then transported to their final destination via Global Van Lines. If believed, this story established probable cause to believe that Buster and Freitas were engaged in criminal activities. As noted above, the story was not demonstrably based on personal knowledge of the informant, and did not contain other intrinsic indicia of trustworthiness; therefore, the critical question is whether its trustworthiness was sufficiently assured by corroborating evidence.

The subsequent FBI surveillance tended to corroborate certain aspects of the second informant's information, as did the tip previously received. The agents' observations revealed that Buster and Freitas were indeed importing furniture from Peru, a suspicious point of origin, and that they had on occasion used Global Van Lines. On the other hand, some results of the FBI's investigation failed to confirm the informant's report. The report given in 1978 indicated that the smugglers were using Global Van Lines; Global's records did not disclose any shipments by the suspects prior to March, 1979. More importantly, the careful Customs search of the May, 1980 furniture shipment failed to uncover any indication of illegal drug activity.

The corroboration of the informant's report that Buster and Freitas were importing furniture using Global Van Lines on

5. The first tip apparently did not purport to describe a modus operandi for the alleged scheme, but only stated that Giarusso and "Mike" were using a "pretext/cover furniture company." Except for the fact that furniture was mentioned, this detail was not particularly similar to the second tip, which set forth a modus operandi with considerable particularity.

some occasions was not enough to establish the trustworthiness of the informant's other allegation that the suspects were using the furniture cover to import drugs. Importing furniture is not itself an incriminating activity, and activities innocuous in themselves are entitled to much less weight as corroboration than incriminating ones. 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* 557 (1978); *see United States v. Larkin,* 510 F.2d 13, 15 (9th Cir.1974); *see also United States v. Jackson,* 544 F.2d 407, 412 (9th Cir.1976) (Hufstedler, J., dissenting) ("Corroboration of innocuous details will not pass the *Aguilar-Spinelli* test."). As Professor LaFave has observed, " 'a skillful liar would always allege *some* true innocent facts to make his story appear credible.' " 1 W. LaFave, *supra,* at 556 (quoting Note, 54 Cornell L.Rev. 958, 967 (1969)). Although *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) shows that an accumulation of innocent details can sometimes sufficiently corroborate an informant's report, the report involved here was not nearly as specifically detailed as that in *Draper;* nor were the details corroborated as thoroughly as those in *Draper. Cf.* 358 U.S. at 313, 79 S.Ct. at 333.

The Government stresses heavily the additional corroboration the informant's report received from the agents' later observation of "evasive driving" and other alleged counter-surveillance techniques employed by the suspects. We agree with the Government's suggestion that *United States v. Bernard,* 623 F.2d 551 (9th Cir. 1979), is closely on point. In *Bernard,* Drug Enforcement Administration (DEA) agents were told that the defendant was involved in manufacturing methamphetamine, that he and two others were currently operating a clandestine methamphetamine laboratory in Umatilla County, Oregon, and that through a fertilizer manufacturing "front" business, the three would be purchasing and stockpiling chemical ingredients for the manufacturing of methamphetamines sometime around March, 1978. *Id.* at 553.

Subsequent DEA investigation corroborated much of this information. Bernard was observed purchasing methamphetamine precursor chemicals on at least four occasions. After some of these purchases, DEA agents saw Bernard taking apparent counter-surveillance measures, including evasive driving quite similar to that described in the present case. *See id.* at 553 n. 5, 554. As in the present case, the first informant's tip was also partially corroborated by other informant tips relating to methamphetamine production in the same area. The court summarized the total evidence known to the arresting DEA agent as follows:

(1) an informant's tip that defendant Bernard was operating an illegal methamphetamine laboratory and might be ready to produce the drug sometime around March, 1978; (2) corroborating surveillance information that Bernard was purchasing the ingredients necessary to produce the drug and that some of the chemicals were located in Meacham, Oregon and probably in the Hermiston, Oregon area; (3) knowledge that Bernard and his associates acted suspiciously while purchasing chemicals, indicating that they were conducting counter-surveillance; (4) knowledge that Bernard had phoned the supplier of chemicals the morning of the day before the arrest that Childress would pick up the chemicals, and that Childress and Bard did in fact pick them up that afternoon; (5) knowledge that vehicles which had been at the residence in Meacham and Hermiston, where some of the chemicals were located, were together at the scene of the arrest, and (6) knowledge that Bernard associated with suspected drug traffickers.

*Id.* at 559 (footnote omitted).

Yet despite all of this corroboration, the court still concluded that the "information known to [the agent] was insufficient to warrant a prudent man in the belief that the defendants were committing an offense." *Id.* at 560. Only when DEA agents later smelled amphetamines cooking and saw one of the suspects run out of the laboratory choking on fumes did probable

cause to arrest arise, the court ruled. *Id.* at 560–62.

The information known to the FBI agents in the present case is very similar to the information known to the DEA agent during the first stage of *Bernard.* The FBI agents did not see any illegal drug, and they also did not see any instances of interaction between the suspects and third parties that would verify the hypothesis that trafficking in some commodity other than furniture was occurring. *Cf. United States v. Valenzuela,* 546 F.2d 273, 275 (9th Cir. 1978). Such an observation would have been analogous to the additional corroboration required to provide probable cause in *Bernard.*

The question whether probable cause to search the appellant's vehicle was present is extremely difficult, because this is a borderline case. Had the FBI agents here obtained a determination that probable cause existed, in the form of a warrant from a neutral and detached magistrate, prior to making the arrests and search in this case, we might well have held that this is a doubtful case in which preference should be given to the validity of a warrant. But here we examine a search "without a warrant [that] bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); *cf. United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *United States v. Flores,* 679 F.2d 173, 176 (9th Cir.1982). Because the agents did not choose to seek a warrant, however, we are

mindful of the Supreme Court's statement that "[l]aw enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate." *United States v. Watson,* 423 U.S. 411, 423, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1976).[6] *See also United States v. Ventresca,* 380 U.S. at 106, 85 S.Ct. at 744 (citing *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960)) ("'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall").[7]

## III

## CONCLUSION

In light of *Bernard,* our precedent closest in point, that strongly suggests that the facts and circumstances known to the officers in this case were insufficient to amount to probable cause, we cannot sustain the FBI agents' on-the-spot determination that they had probable cause to search the van driven by Buster. It is uncontested that Buster had a legitimate expectation of privacy in the van. We conclude that the search violated his fourth amendment rights, and that all evidence obtained in the search and as a fruit of the search should have been suppressed in his trial. Since Buster was found guilty exclusively on the basis of this evidence, his conviction must be REVERSED.

As stated above, Freitas has not shown that he has standing to challenge the van search as a violation of his fourth amendment rights. His case is REMANDED for a determination on that issue.

---

**6.** The Government has never suggested that any exigency required an immediate warrantless arrest of the appellants and search of their van upon its arrival at Gray's residence. The agents, suspecting contraband to be located in the rear of the van, could have continued their surveillance of the van, its cargo, and the suspects while bringing the facts and circumstances underlying their suspicion before a magistrate in a search warrant application.

**7.** For cases whose results illustrate this distinction, *compare United States v. Goff,* 681 F.2d 1238, 1239–40 (9th Cir.1982) (informant information held sufficiently corroborated where warrant obtained) *with United States v. Johnstone,* 574 F.2d 1269, 1272–73 (5th Cir.1978) (tip held insufficiently corroborated where no warrant obtained).

The Government has urged on petition for rehearing that *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), decided since the filing of our opinion, requires us to find that probable cause supported the search of Buster's van.

At the outset we observe that the search in *Illinois v. Gates* was conducted pursuant to a warrant issued by a neutral and detached magistrate. The Court held that the Illinois courts had overstepped the limits that must confine scrutiny of the magistrate's ruling on a warrant application. As used for purposes of such review, the Court found the *Aguilar-Spinelli* test improper because the subtleties of the inquiry "cannot be reconciled with the fact that many warrants are—quite properly . . . —issued on the basis of non-technical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." *Gates,* 103 S.Ct. at 2330–31. Consequently, "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Id.* The duty of a reviewing court "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960) ).

Justice Rehnquist, writing for the Court in *Gates,* stressed the importance of the magistrate's role in assessing whether probable cause exists to arrest a person or to search a given location. He cautioned that "under our opinion magistrates remain perfectly free to exact such assurances as they deem necessary . . . in making probable cause determinations." *Id.,* 103 S.Ct. at 2333. Justice Rehnquist's assurance would go for naught if police were free to sidestep the magistrate, who might demand additional evidence, and to make their own search based on less evidence than the magistrate would require. *Gates* repeatedly stresses, as does our prior opinion, "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Id.* at 2331.

Because the search under challenge in the present case was warrantless, we have acted consistently with the mandate in *Gates* by applying our own independent judgment to assess whether there was probable cause to search Buster's van. The sufficiency of the facts known to the FBI agents depended entirely upon the weight to be given the report of the second confidential source. The "veracity," "reliability" and "basis of knowledge" of this informant are all highly relevant in determining the value of his report, *Gates,* 103 S.Ct. at 2327, but according to the *Gates* court, the *Aguilar-Spinelli* test has been applied in an unduly rigid fashion when considering whether an informant's report has been sufficiently corroborated to establish an adequate foundation for relying upon the report in a probable cause determination, *see id.* at 2330 & n. 9; *id.* at 2331 n. 10. We have not in fact applied the "prongs" of the *Aguilar-Spinelli* test in an unyielding fashion. Rather, after examination, we found that the number and type of details known to FBI agents were not enough to show that the second source's tip should be credited. The details were less specific than those held sufficient to demonstrate reliability in *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959), or, for that matter, in *Gates. See* 103 S.Ct. at 2325–26. Had the agents known something about the basis upon which the source made his report, they might properly have credited it, but they did not have such knowledge.

In its petition for rehearing, the Government cites several facts that it claims were overlooked in the prior opinion. These facts are: (1) aerial surveillance of the van on May 29, which showed that after the basket was placed in the van, the van twice accelerated in the left freeway lane, then moved right and exited the freeway; (2) local police reports disclosed that Morter, Link and Gray, as well as Buster, were narcotics suspects; (3) the pillows placed in the van were unlike any items previously observed in the furniture shipment; (4) the manner in which Freitas and Buster looked about them as they approached the warehouse; and (5) the fact that Freitas and

Buster were observed driving three different vehicles in a one-hour period. We did not overlook these facts. Rather, we concluded that none of these observations made any significant contribution to the critical question facing the agents prior to their decision to search the van, which was whether the informant's report was sufficiently reliable to be credited. We adhere to our original conclusion that the agents lacked probable cause to search the van.

The petition for rehearing is granted in part and denied as to the balance.