### UNITED STATES of America, Plaintiff-Appellee,

v.

### Carolyn LANDIS, Fred Landis, and Lee Norman Clark, Defendants-Appellants.

### Nos. 83–1085, 83–1086 and 83–1103.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 16, 1983.

Decided Feb. 22, 1984.

Certiorari Denied June 4, 1984. See 104 S.Ct. 2688.

---

Thomas T. Couris, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Clifford Tedmon, E.R. Walker, Clyde M. Blackmon, Blackmon, Wasserman & Segal, Sacramento, Cal., for defendants-appellants.

Before WRIGHT, CHOY, and POOLE, Circuit Judges.

CHOY, Circuit Judge:

Defendants were convicted of various and sundry counts relating to the illicit manufacture of methamphetamine. They appeal from the denial of their pretrial motions to suppress evidence found at their residences, contending insufficiency of the affidavit offered to obtain the search warrants. We affirm.

## I. BACKGROUND

Lee Norman Clark is a physician. Fred Landis is a dentist. They, along with Carolyn Landis, were convicted of manufacturing methamphetamine, conspiracy and attempt to manufacture methamphetamine, and possession of the controlled "precursor chemical" phenyl–2–propanone (P2P) with intent to manufacture methamphetamine. Most, if not all, of the dispositive evidence against Clark and the Landises was obtained through searches of their respective residences. Warrants for those searches were issued by Senior U.S. District Judge Sherrill Halbert, on the basis of identical affidavits executed by DEA Special Agent Patrick Gregory.

This case presents the essentially factual question of whether probable cause existed to justify the search of the Clark and Landis residences, using the standards recently set forth in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). When, as here, confidential informants are used to supply facts necessary to a determination of probable cause, the two-pronged *Aguilar-Spinelli* test generally has been applied. First, the affidavit had to reveal adequately the informant's basis of knowledge—that is, how the informant came upon the information given. Second, the affidavit had to establish the veracity of the informant or the reliability of that particular report, as by a history of reliable information or by corroboration. 103 S.Ct. at 2327 & n. 4. In *Gates,* the Supreme Court abandoned the two-pronged test, saying instead that veracity, reliability, and basis of knowledge are all relevant but are not separate and independent requirements. *Id.* 103 S.Ct. at 2327–28. As the Court stated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* 103 S.Ct. at 2332 (citation omitted). We now turn to the individual defendants.

## II. LEE NORMAN CLARK

Most of the inculpatory information about Lee Clark's activities comes from one informant, referred to herein as Source # 1. Source # 1 told DEA agents that Lee Norman Clark was a medical doctor who did not work but who derived his income from selling "speed." Farrell Clark, Lee's son, had given him this information. Source # 1 apparently had been inside the Clark residence, for he had observed several strange chemicals in Lee Clark's bedroom. Source # 1 was told by Leah and Farrell Clark that Lee was manufacturing methamphetamine in his basement, and Source

# 1 apparently had seen the basement, describing it as a vented room. Further, Lee Clark himself had approached Source # 1 about the possibility of selling drugs for him.

Apparently, the basis of Source # 1's knowledge is observation of the methamphetamine laboratory and the personal trust of Lee Clark himself. It is hard to imagine a more reliable basis for information than one who had been taken into the defendant's confidence. As to the veracity of the informant, a police investigation corroborated much of his information. Clark was in fact a medical doctor, but apparently did not practice. His listed place of business was his home, at which there was no visible evidence of a medical practice. Clark did not have a listed telephone number or hospital privileges and the only prescriptions he wrote for controlled substances were for members of his family. Finally, Lee Clark's phone tolls in the first six months of 1982 showed calls to chemical suppliers but the chemicals were apparently unrelated to medical practice, since Lee Clark was not practicing. In sum, Source # 1's information would have been an acceptable basis for a probable cause determination even under *Aguilar* and *Spinelli.* Under current law, the search of the Clark residence must be upheld.

Clark, however, contends that Source # 1's information was stale. *See Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932); *United States v. Freeman,* 685 F.2d 942, 951 (5th Cir.1982). The facts point to a different conclusion. Much of the corroborative information was learned on or around April 1982, two months before the warrant issued. Because Source # 1 learned his information in late 1981 and the information was corroborated in April 1982, Judge Halbert had a substantial basis for concluding that the Clark residence housed illegal activity of a continuous nature. The continuous nature of the activity diminishes the significance of the time lag between the acts described in the affidavit and presentation of the affidavit to

the magistrate. *United States v. Hershenow,* 680 F.2d 847, 853 (1st Cir.1982); *Mapp v. Warden, New York State Correctional Institution for Women,* 531 F.2d 1167, 1171–72 (2d Cir.), *cert. denied,* 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976); *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972). Judge Halbert thus had a substantial basis for finding probable cause that contraband or evidence of crime would be found in the Clark residence in June 1982.

## III. FRED AND CAROLYN LANDIS

The search of the Landis residence presents a much closer question. The portions of Special Agent Gregory's affidavit that pertain to the Landis residence relate the following facts:

1. On June 8, 1982, a confidential source, "Source # 3," informed DEA agents that Lee Norman Clark had gone to Chico, California to manufacture methamphetamine. Source # 3 said that Clark was currently at Landis' address in Chico, and that she [1] had seen "glassware which [she] knows is used for the manufacture of methamphetamine" at that address.

2. Source # 3 had no criminal record, and she had previously given reliable information to DEA agents.

3. Agent Gregory travelled to the Landis residence on June 8, 1982 and saw two of Lee Norman Clark's vehicles there—one car and one truck.

4. On that same day, Agent Gregory was able to hear sounds emanating from an outbuilding at the Landis residence that "sounded like a pump and running water" and that "were consistent with sounds I have heard at other clandestine laboratory sites."

5. On June 9, 1982, agents telephoned Fred Landis' business and were told that Landis would be out of town for the next five days. Agents also learned from other confidential sources that Clark recently had been observed to be absent from his own residence for extended periods of time.

---

1. By a toss of the coin, Source # 1 is referred to here as "he" and Source # 3 as "she."

Gregory knew from experience that the clandestine manufacture of methamphetamine is a time-consuming process.

6. Landis' residence is in a remote, isolated location with limited access to the property, which was also consistent with Gregory's knowledge of clandestine laboratories.

7. Telephone tolls of the Landises and Clark revealed calls to businesses that supply glassware and chemicals which can be used to manufacture methamphetamine.

The only explicit association between the Landis residence and the criminal manufacture of methamphetamine was provided by Source # 3. To credit a confidential source's information in making a probable cause determination, the affidavit should support an inference that the source was trustworthy and that the source's accusation of criminal activity was made on the basis of information obtained in a reliable way. *United States v. Pryba,* 502 F.2d 391, 402 (D.C.Cir.1974), *cert. denied,* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975); *see Satchell v. Cardwell,* 653 F.2d 408, 411 (9th Cir.1981), *cert. denied,* 454 U.S. 1154, 102 S.Ct. 1026, 71 L.Ed.2d 311 (1982). We think the facts in the affidavit, taken as a whole, did provide a substantial basis for Judge Halbert to credit Source # 3's information and conclude that criminal activity probably was taking place.

First, Source # 3's information was reliable in the past and her current information was based on her personal observation of distinctive glassware. Those facts lend credibility to a confidential source. *See United States v. Moore,* 522 F.2d 1068, 1073 (9th Cir.1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976).

Second, her information was corroborated to a significant degree by the agents' investigation. Source # 3 said that Lee Norman Clark would be at the Landis residence; not one but two of his vehicles were identified there. Furthermore, Agent Gregory heard distinctive sounds coming from an outbuilding on the property. Although Agent Gregory likened the sounds to those of a pump and running water, which at first blush sounds innocuous enough, a DEA agent's "special training and experience may enable him reasonably to suspect that criminal activity is afoot from observing what might appear innocuous to the uninitiated." *United States v. Woods,* 720 F.2d 1022, 1027 (9th Cir.1983).

Our conclusion here is not inconsistent with *United States v. Tate,* 694 F.2d 1217 (9th Cir.1982), *petition for cert. filed,* 52 U.S.L.W. 3011 (U.S. July 8, 1983) (No. 83–24). In *Tate,* an informant smelled a strong odor of ether emanating from the defendants' premises. Officers corroborated the informant's observation and told the magistrate that the manufacture of phencyclidine (PCP) emits a strong odor of ether. We held that the smell of a substance having many innocuous uses, without more, does not establish probable cause to search. *Id.* at 1220–21. Here, however, the sounds like that of a pump and running water did not stand alone. The informant stated that methamphetamine manufacture was taking place—a factor conspicuously absent in *Tate, id.* at 1221—and the DEA agent's observations corroborated that information.

Finally, Lee Clark's presence at the Landis residence with glassware used in a chemical manufacturing operation, combined with the overwhelming indications provided by Source # 1 that Lee Clark was a methamphetamine manufacturer, further buttressed Source # 3's conclusion that methamphetamine was being manufactured at the Landis residence. Interlocking tips from different confidential informants enhance the credibility of each. *United States v. Weinrich,* 586 F.2d 481, 490 (5th Cir.1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979); *United States v. Hyde,* 574 F.2d 856, 863–64 (5th Cir.1978); *see Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States v. Freitas,* 716 F.2d 1216, 1222 (9th Cir.1983).

Thus, when confronted with the affidavit in this case we cannot say that there was no

substantial basis for Judge Halbert to believe Source # 3 and thereby find a "probability, and not a prima facie showing, of criminal activity [which] is the standard of probable cause." *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

The judgments of conviction appealed from are AFFIRMED.

POOLE, Circuit Judge, dissenting:

I dissent. Neither affidavit contains sufficient facts to establish probable cause. The majority's attempt to save the affidavits will not withstand scrutiny.

*The Clark Home*

The majority's analysis of the Clark affidavit is misleading. The majority states that, *"[a]pparently,* the basis of Source # 1's knowledge is observation of the methamphetamine laboratory . . . ." Maj. op. at 542 (emphasis added). The affidavit does not indicate any such observation. The only information provided to the district judge who issued the warrant was that "sometime" between March and November, 1981, Clark's children supposedly told an anonymous informant, "Source # 1," that Clark was manufacturing "speed" in his basement. The only inference possible is that the informant told the DEA agent that appellant Clark's son had done so. There is no indication that Source # 1 had any personal knowledge of the underlying allegation, or that Source # 1 had ever observed a laboratory.

Agent Gregory stated that a laboratory would make sounds like "a pump and running water" and it would produce "noxious odors." But if Source # 1 had "apparently" at some time been in the Clark home, he never said that he heard such sounds or smelled such odors. The affidavit only establishes one thing: Source # 1 did not see, hear, or smell the laboratory. Any contrary conclusion is pure conjecture, and improperly indulged in to justify an unwarranted search and seizure.

The majority also states that *"apparently"* Source # 1 had seen the basement where the drugs were manufactured. Maj. op. at 542 (emphasis added). This is certainly *not* "apparent" from the recitals of the affidavit. This too is without support. The affidavit states that "[t]he confidential source stated that Clark manufactured methamphetamine in a vented room in the basement of the residence." If Source # 1 had seen the basement, the affidavit should have reflected that fact. Throughout the affidavit, whenever Source # 1 had in fact observed something, this was specifically indicated.

Besides "liberally construing" the affidavit, the majority points to the fact that Source # 1 saw "unfamiliar" chemicals in Clark's bedroom. I am at a loss to understand the connection between this uninformative statement and Clark's illicit manufacturing operation. No facts are set forth to support Source # 1's purported conclusion. We are not told that he had expertise in identifying chemicals, nor is it explained what is meant by "unfamiliar." Apparently the majority equates "unfamiliar" with illegal. In this state of information, such an inference is improper. To one untrained in chemistry, many legitimate chemicals would be "unfamiliar."

The majority attempts to bolster Source # 1's veracity by claiming that "a police investigation corroborated much of his information." Maj. op. at 542. However, all this police corroboration related solely to innocent details, completely unrelated to Clark's criminal activity. For instance, the police corroborated that Clark was a doctor without hospital privileges, who did not practice his profession, and had an unlisted phone number. This intelligence corroborates no aspect of Source # 1's allegation that Clark was manufacturing drugs in his basement. Many doctors without hospital privileges do not make methamphetamine in their basements. Moreover, thousands of people with unlisted phone numbers are not drug manufacturers and many professionals, including lawyers and judges, maintain neither offices nor chambers.

Additionally, the police uncovered that Clark only wrote prescriptions for con-

trolled substances for family members. Clark was legally entitled to prescribe these drugs. There is no corroboration in these prescriptions, which were presumably filled with legally acquired drugs, and no known connection between these prescriptions and Clark's illegal drug operation.

Essentially, the majority assumes that corroboration of largely insignificant facts will establish the credibility of the informant. This is a faulty assumption. At the very least there must be produced facts bearing *some* relationship to the criminal activity alleged. Without this connection, the warrant should not issue.

One must assume that the affidavit's absence of allegations of *any* firsthand knowledge, and the suggestive but indirect manner of exposition, are contrived, not accidental. The documents seem to have been deliberately couched in vagueness, and no matter how eminent the official may be, who, sitting as a federal magistrate, issued the search warrant, the probable cause is simply lacking. The affidavit was patently insufficient.

*The Landis Home*

The majority admits that the search of the Landis home is a "much closer question," Maj. op. at 542, but still concludes that the search was permissible. I disagree. There was an even greater lack of probable cause to search the Landis home than there was to search the Clark home.

The most significant information provided by the informant in this case, Source # 3, was her mere conclusion that "Lee Clark is currently at [the Landis home] to manufacture methamphetamine." Source # 3 never said how she acquired this information. As a result the district judge was unable "to verify the [conclusion] and confirm that [it was] not based merely on rumor or reputation." *United States v. Chesher,* 678 F.2d 1353, 1359 (9th Cir.1982).

The *only* fact provided by Source # 3 is that she observed "glassware which she knows is used for the manufacture of methamphetamine." Source # 3 does not describe the glassware or say why it could only be used to manufacture methampheta-

mine, nor what gave her the descriptive expertise to suggest that it could not have been useful for legitimate chemicals.

Source # 3's bald assertion coupled with her observation of "glassware" is a far cry from *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). There the informant's anonymous letter "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip . . . ." *Id.* 103 S.Ct. at 2335. The amount of detail provided by Source # 3 was not enough to suggest that she was an insider to the drug operation or otherwise had to know something an ordinary, suspicious observer would not.

Agent Gregory's information is equally deficient. Gregory's only personal observation was that he heard sounds like that of a "pump and running water" emanating from the building. These are common sounds which can be produced by many normal household activities. Before such ordinary sounds or odors can be used to establish probable cause, it must be shown that they are "sufficiently distinctive to identify a forbidden substance." *Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948).

Gregory also claimed that the remoteness of the Landis home was consistent with a clandestine laboratory. According to Gregory the remoteness was needed to conceal "noxious odors." But Gregory never smelled these odors. Moreover, neither the magistrate nor we were ever told that anyone smelled these odors emanating from Clark's home.

The fact that Landis and Clark telephoned three chemical supply companies which manufactured chemicals "which can be used to manufacture methamphetamine," Maj. op. at 543, does not bolster this flimsy case. There is no indication that any glassware or chemicals were ever ordered. One may guess that these companies sell many products that can be used to produce legal chemicals.

I am therefore convinced that there was insufficient probable cause to search the

Landis home. Source # 3's conclusory assertion coupled with Agent Gregory's observation of commonplace sounds and even bolstered by Source # 1's tips do not satisfy the "totality of the circumstances" test.

Finally, all the facts which the majority details at page 543 are innocent, or equivocal, and without nexus to the probability that the appellants were engaged in the criminal manufacturing for which the search was intended.

Approval of the issuance of a warrant on the nebulous grounds presented by the affidavits here, do us and the magistrate no credit. But, more than that, it denigrates the protections which we are commanded in every case to afford. That the search turned up evidence by which a conviction was won is not, as I read the books, the point.

I would reverse.